UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MINERVA GARZA,<br><br>                Plaintiff,<br><br>    v.<br><br>Commissioner of Social Security,<br><br><br>                Defendant. | No. 1:22-cv-00207-GSA<br><br><br>**ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF AND AGAINST DEFENDANT**<br><br>**(Doc. 19)** |

### I.      Introduction

Plaintiff Minerva Garza appeals the decision of the Commissioner of Social Security denying her application for disability insurance benefits (DIB) under Title II of the Social Security Act.

### II.      Factual and Procedural Background[1]

On June 4, 2015 Plaintiff applied for DIB alleging disability as of June 1, 2014.  The applications were denied initially and on reconsideration.  AR 105-109; 112-116.  After two continuances the ALJ held a hearing on April 15, 2020.  AR 42–65.  On April 24, 2020, the ALJ issued an unfavorable decision.  AR 18–41.  The Appeals Council denied review on September 24, 2020, and this appeal followed.

### III.     The Disability Standard

Under 42 U.S.C. §405(g), this court has the authority to review the Commissioner's denial of disability benefits.  Reversal is appropriate when the ALJ's findings are based on legal error or unsupported by substantial evidence."  *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).  Substantial evidence is that which could lead reasonable minds to accept a conclusion.  *See*

---

[1] The parties are well informed as to the medical, opinion and testimonial evidence, which will not be exhaustively summarized.  Relevant portions will be referenced in the course of the analysis below when relevant to the parties' arguments.

*Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla but less than a preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996).

The court must consider the record as a whole, not isolate a specific portion thereof. *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).  If the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision.  *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

A disability claim is evaluated using five-step analysis.  20 C.F.R. §§ 416.920(a)-(f).  The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled.  20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level.  20 C.F.R. § 416.920(a)-(f).  While the Plaintiff  bears the burden of proof at steps one through four, the burden shifts to the commissioner at step five to

prove that Plaintiff can perform other work in the national economy given her RFC, age, education and work experience. *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014).

## IV.    The ALJ's Decision

At step one the ALJ found that Plaintiff had not engaged in substantial gainful activity since her amended disability onset date of October 21, 2015.  AR 24.  At step two the ALJ found that Plaintiff had the following severe impairments: right shoulder impingement syndrome and slight rotator cuff tear, status post right shoulder arthroscopy with cervical decompression; degenerative joint disease of the right shoulder; left knee meniscal degeneration; chronic migraine; right knee osteoarthritis, status-post chondroplasty and medial meniscectomy; mild bilateral SI joint osteoarthritis; degenerative disc disease of the lumbar spine; and, obesity.  AR 25.

At step three the ALJ found that Plaintiff did not have an impairment or combination thereof that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 25.

Prior to step four the ALJ evaluated Plaintiff's residual functional capacity (RFC) and concluded that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) subject to the following:

> the claimant can lift and or carry 20 pounds occasionally and 10 pounds frequently; she can push and or pull within the weight limits noted above; she can never climb ladders, ropes or scaffolds; she can perform all postural activities occasionally but she can never crawl or kneel; she cannot perform overhead reaching with her right upper dominant extremity but she can reach to shoulder level; she can stand and or walk for six out of an eight-hours work day; she can sit for six out of eight-hour workday, with the ability to stand and stretch, or rest and elevate the legs, every two hours for 10 to 15 minutes, falling within the normal breaks and lunch periods[2]; she cannot be exposed to any hazardous work environments such as working at unprotected heights, operating fast or dangerous machinery, or driving commercial vehicles; and she cannot work in extreme cold and or damp/humidity.  AR 25-32.

At step four the ALJ concluded that Plaintiff could not perform her past relevant work as a cleaner or agricultural packer (as both were classified at the medium exertional level).  AR 32.  At step five, in reliance on the VE's testimony, the ALJ concluded that there were jobs existing in

---

[2] One would normally expect than an employee would be free to do whatever they wish during work breaks and lunch periods.  Hence,  these periods of standing/stretching/leg elevation were not necessary as an accommodation and should not have been specified in the RFC.

significant numbers in the national economy which Plaintiff could perform: cashier, storage facility rental clerk, and sales attendant.  AR 33.  Accordingly, the ALJ concluded that Plaintiff was not disabled at any time since her amended alleged disability onset date of October 21, 2015.  AR 34.

## V.    Issues Presented

Plaintiff asserts two claims of error: 1) the ALJ failed to properly weigh the opinion of her treating physician, Dr. Sharma; and, 2) the ALJ's credibility determination is not supported by substantial evidence.  The ALJ offered the same reasoning for discounting both Dr. Sharma's opinion and Plaintiff's testimony, perhaps with the addition of "routine and conservative treatment" and improvement after surgery, both of which will be separately addressed below.  However, no independent discussion of Plaintiff's testimony is necessary as Plaintiff's testimony mirrors the limitations identified by Dr. Sharma.  The ALJ's reasoning, as detailed below, was equally flawed in both respects.

### A.    Dr. Sharma's Opinion/ Plaintiff's Testimony

#### 1.    Applicable Law

Before proceeding to step four, the ALJ must first determine the claimant's residual functional capacity.  *Nowden v. Berryhill*, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018).  The RFC is "the most [one] can still do despite [his or her] limitations" and represents an assessment "based on all the relevant evidence." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The RFC must consider all of the claimant's impairments, including those that are not severe.  20 C.F.R. §§ 416.920(e), 416.945(a)(2); Social Security Ruling ("SSR") 96–8p.

In doing so, the ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities.  *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995).  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment."  *Robbins,* 466 F.3d at 883.  *See also* 20 C.F.R.

§ 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

For applications filed before March 27, 2017, the regulations provide that more weight is generally given to the opinion of treating physicians, which are given controlling weight when well supported by clinical evidence and not inconsistent with other substantial evidence. 20 C.F.R. § 404.1527(c)(2); *see also Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995), as amended (Apr. 9, 1996) (noting that the opinions of treating physicians, examining physicians, and non-examining physicians are entitled to varying weight in residual functional capacity determinations).

An ALJ may reject an uncontradicted opinion of a treating or examining physician only for "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a contradicted opinion of a treating or examining physician may be rejected for "specific and legitimate" reasons. *Id.* at 830. In either case, the opinions of a treating or examining physician are "not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999). Regardless of source, all medical opinions that are not given controlling weight are evaluated using the following factors: examining relationship, treatment relationship, supportability, consistency, and specialization. 20 C.F.R. § 404.1527(c). The opinion of a non-examining physician (such as a state agency physician) may constitute substantial evidence when it is "consistent with independent clinical findings or other evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

**2.    Analysis**

Dr. Sharma, Plaintiff's treating physician of the previous six years, completed a Physical

Medical Source Statement (AR 748-751) dated December 13, 2019 which opined that Plaintiff: could sit/stand/walk 30 consecutive minutes and 2 hours total in a workday; would need to be able to shift positions at will and walk for 5 minutes every hour; could lift/carry up to 10 pounds occasionally, rarely 20 pounds, and never 50 pounds; could rarely perform postural activities; would likely be off task 25% or more; was incapable of low stress work; and, would have 4 absences per month.  AR 748-751.  Dr. Sharma identified supporting clinical findings (though not by date) generally of reduced range of motion in the shoulder and cervical spine, as well as decreased sensation and motor strength of the upper extremities.

Plaintiff's testimony was largely to the same effect.[3]

The ALJ gave Dr. Sharma's opinion little weight, explaining as follows:

> Generally, the opinions of treating physicians are considered more reliable because of the duration of the treating relationship (20 CFR 404.1527(d)(2)). However, Dr. Sharma's opinion is inconsistent with the record as a whole, as discussed above, as well as internally inconsistent. As noted above, Dr. Sharma noted the claimant as stable and continued her on her medications with no changes and with little further treatment. In addition, as also noted above, the claimant has had mostly normal physical examinations with mild to moderate findings on imaging studies. In addition, Dr. Sharma's opinion that the claimant has no manipulative limitations is inconsistent with the claimant's history of right shoulder pain and subsequent surgery, as discussed above. For these reasons, Dr. Sharma's opinion is given little weight.

Similarly, the ALJ addressed Plaintiff's testimony as follows:

> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because the medical evidence of record indicates that the claimant has received routine and conservative treatment, with mostly normal physical examinations and only mild to moderate findings on imaging studies. In addition, although the claimant underwent surgery on her right shoulder, as well as

---

[3] In particular, Plaintiff emphasizes the following testimony: "Her arthritis prevents her from sitting or standing for extended periods. AR 49. She also experiences pain of the right shoulder, which is her dominant arm. AR 49-50. Her pain persisted despite surgical intervention. AR 50. Her right shoulder pain rates at an eight or nine on a scale of ten. AR 50. The pain is present even at rest. AR 51. The pain is worsened by any activity or movement. AR 51. She can use her right shoulder for approximately seven minutes. AR 51. Plaintiff also has pain of the neck. AR 51. Her neck pain also rates an eight on a pain scale of ten. AR 52. She also experiences pain of the back, hips, and knees. AR 52. Her back pain is constant and worsened by standing, sitting, walking, bathing, and physical activity in general. AR 53. She can sit for approximately ten minutes before she can no longer tolerate her back pain. AR 53. She can walk for approximately four minutes and stand for five to seven minutes. AR 53. She can lift fifteen to twenty pounds. AR 53. She had surgery on her knee in February. AR 54. She has difficulty with walking and kneeling as a result of her knee pain. AR 54. She must elevate her legs with a pillow to relieve these symptoms. AR 54. Prior to her surgery she had to elevate her legs every one to two hours for thirty minutes each time. AR 54-55."

6

her right knee, she reported improvement after both surgeries, which improvement is also supported by the medical evidence of record

Plaintiff primarily contends that the ALJ was not accurate in characterizing the medical evidence as reflecting mild to moderate imaging studies, normal physical exams and routine/conservative treatment.  Defendant contends to the contrary.  The Court finds that the ALJ's characterization was unsupported for the reasons explained below.

<b>a.   <u>"Mild to Moderate" Findings On Imaging Studies; "Mostly Normal" Physical Exams</u></b>

Where a claimant has dysfunction of nearly every major joint (two of which required surgical repair), generalizations about the claimants imaging studies and physical exams are suspect.

<b>b.   <u>Right Shoulder</u></b>

A November 3, 2015 right shoulder MRI showed: <u>slight</u> fraying of the posterior superior labrum without discrete labral tear; supraspinatus and infraspinatus tendinosis/tendinopathy; <u>subtle</u> partial articular side tear of the supraspinatus; <u>moderate</u> degenerative changes of the acromioclavicular joint with reactive narrow signal changes in the acromion and clavicle; mass effect on the subjacent supraspinatus muscle (which the radiologist noted could cause impingement symptoms); and, stippled degenerative cystic changes of the posterior lateral right humeral head.  AR 27 (citing AR 493).

Several of the findings did not have a description of severity whether mild, moderate, or otherwise.  Even assuming mild to moderate findings suggest a relatively benign condition, that is less true when noted among various other abnormalities of a shoulder that already required surgical repair of a torn rotator cuff (AR 513); where the radiologist himself noted the findings could cause impingement symptoms; and, where the physical exams documented abnormalities as discussed below.

Further, insofar as the MRI also noted degenerative changes of unspecified severity (at least unspecified by the radiologist), interpretation thereof by another clinician would be relevant.  Here, the only other interpretation of the MRI was provided by Dr. Sharma.  Dr. Sharma described, "MRI R Shoulder DJD MOD SEVERE", seemingly indicating that Dr. Sharma's impression of the shoulder

7

imaging findings as a whole reflected moderate to severe degenerative joint disease of the right

shoulder, not mild to moderate as characterized by the ALJ.  AR 511.

After describing the MRI results the ALJ then states, "However, x-rays of the claimant's right

shoulder, taken on November 5, 2019, showed only scattered degenerative changes but there was no

evidence of acute osseous or articular abnormality *and soft tissues were normal* in appearance [Exhibit

9F/3]."  AR 27 (emphasis added).  The implication here is that the ALJ viewed this x-ray as a

countervailing finding juxtaposed to the MRI.  This is not altogether a reasonable interpretation,

particularly as to soft tissue abnormalities versus bony abnormalities.  The MRI would show the soft

tissues with far more detail than the x-ray.  Indeed, the x-ray radiologist acknowledged the limitations

of that study and noted that an MRI is indicated if symptomology is persistent.  AR 501.

With regard to  Dr. Sharma's physical examinations of Plaintiff's shoulder, the ALJ stated:

> Further, in follow up at an office visit with her primary care physician, Dr. Sharma, on November 16, 2015, the claimant was noted as stable, with only mild atrophy of her right shoulder, tender AC joints bilaterally, and swelling of her left knee with tenderness. Dr. Sharma therefore continued the claimant on her current medication regimen. Dr. Sharma also advised the claimant as to therapeutic exercise as tolerated for the affected areas for a period of four weeks [Exhibit 8F/37-38]. She had further follow up visits with Dr. Sharma in December 2015 and April 2016, with minimal changes noted with the claimant continuing to be noted as stable and continued on her current medication regimen [Exhibit 11F].

This statement does not comport with the ALJ's generalization about "mostly normal physical

examinations."  Muscle atrophy, albeit mild, is not a normal or benign finding, particularly atrophy of

the muscles surrounding the very joint in question, the right shoulder.  That Plaintiff was "stable" is a

non-specific finding.  The ALJ's statement that Dr. Sharma "*therefore* continued claimant on her current

medication regimen" (emphasis added) suggests that the ALJ was drawing a causal connection between

the purportedly benign findings and the fact that Dr. Sharma continued Plaintiff on the current regimen

with no changes.  However, Dr. Sharma made no such connection either overtly or by reasonable

implication.

Further, continuation of the current regimen is not independently suggestive of a benign

condition, which would depend on the nature of the current regimen.  In this instance, the regimen included an opioid (Vicodin) which may or may not be conservative depending on dosage and other factors.  Regardless, the ALJ's characterization regarding no changes to the medication is not correct.  Despite Dr. Sharma's statement about continuing current medications, the top of the very next page of the visit notes indicate that Dr. Sharma added another opioid, Tramadol.  AR 478.

In addition to mild atrophy of the infraspinatus muscle and a/c joint tenderness, there was another finding directly in between those two which the ALJ did not acknowledge, namely ROM of 90 degrees in flexion.  Although this finding was not expressly identified as an ROM deficiency, a simple google search for "should flexion normal range" reveals that normal range is between 150 and 180 degrees.  AR 513.  Importantly, the examinations with Dr. Sharma in 2015 and 2016 noted muscle atrophy, tenderness, and nearly 50% reduced range of motion in flexion, which covers a reasonably broad spectrum of deficiencies one would find upon physical examination.  These findings are not in agreement with the ALJ's characterization of "mostly normal physical examinations."

Plaintiff's right shoulder was also examined by Dr. Georgis on September 11, 2015.  Dr. Georgis noted Plaintiff was status post right shoulder surgery.  Dr. Georgis ultimately opined that Plaintiff could lift/carry 10 pounds frequently and 20 occasionally.  On examination, Plaintiff's right shoulder range of motion was reduced in every direction, including more than 50% reduced in some respects, 120 degrees abduction (150 is normal), 120 degrees in flexion (150 is normal), 25 degrees in adduction (30 is normal), 80 degrees in external rotation (90 is normal), 30 degrees in internal rotation (80 degrees is normal), and 35 degrees in extension (40 is normal).  AR 450.  Muscle bulk, tone, and strength were normal, tenderness was absent and provocation signs were negative save for mildly positive Hawkins sign on the left shoulder.  AR 450–51.

Finally, Plaintiff's right shoulder was examined by Dr. Van Kirk at the consultative examination on December 28, 2019.  AR 743.  Dr. Van Kirk noted, in relevant part, that Plaintiff had generalized discomfort in the right shoulder girdle and that "slowly but surely, she goes through the full range of

motion of the right shoulder."[4]  Plaintiff indicated that the pain started after she fall off a ladder 11 years prior.  She has residual pain particularly with repeated flexion and extension, overhead reaching, pushing/pulling, rotatory motions of the upper extremity, and heavy lifting.  AR 743.

Dr. Van Kirk diagnosed "status-post right shoulder arthroscopic surgery with *slight* residual pain" (emphasis added), though it appears the qualifier (*slight*) came from Dr. Van Kirk, not Plaintiff.  Dr. Van Kirk opined Plaintiff could perform light exertional work, including lift/carry 10 pounds frequently (2/3 of an 8-hour day) and 20 pounds occasionally (1/3 of an 8-hour day), which is slightly less restrictive than Dr. Sharma's opinion that she could lift 10 pounds occasionally and 20 pounds rarely (up to 5% of an 8-hour day).  AR 74.

Notwithstanding that Dr. Van Kirk's physical examination of the right shoulder was not significantly remarkable (save for slow, but full, ROM with slight discomfort), and that both his and Dr. Georgis' opinions supported the ALJ's RFC for light exertional lifting and carrying, the ALJ's generalization concerning "mostly normal physical examinations" is not supported.  Dr. Georgis' examination may have been negative for tenderness and normal as to muscle strength, bulk and tone, but range of motion was diminished in all directions (significantly so with adduction), and Hawkins impingement was positive (notable in light of the 2015 MRI radiologists notation that the findings could cause impingement symptoms).

Further, as to the timing of the three doctors' examinations, Dr. Sharma's examinations (which were largely abnormal) and Dr. Georgis's examination (partially abnormal) were conducted in 2015 and 2016, whereas Dr. Van Kirk's (mostly normal) was conducted more than 3 years later in December 2019.  Thus, the abnormal exams in 2015 and early 2016 would be more indicative of her shoulder functioning at the beginning of the relevant period, while Dr. Van Kirk's December 2019 examination would be more indicative of shoulder functioning toward the end of the relevant period.

---

[4] Though perhaps nitpicking, her range in extension was in fact 40 degrees, whereas normal range is generally identified as low as 45 and as high as 60 depending on the resource consulted.

Thus, even accepting Dr. Van Kirk's opinion it would not preclude a finding that Plaintiff's shoulder impairment rendered her unable to meet the exertional demands of light work for a continuous period of 12 months at some point during the relevant period under review (between the October 21, 2015 alleged onset date, and the ALJ's April 24, 2020 decision date) [5] which could support a closed period of disability if Plaintiff is correct that Medical-Vocational Rule (Grid Rule) 201.09 would mandate a finding of disability at the sedentary exertional level for an individual with Plaintiff's vocational profile (ag, education, work experience).[6]

It also bears mentioning that Dr. Sharma's opinion was not extreme (despite Defendant's characterization) or grossly out of proportion with the opinions of Drs. Georgis or Van Kirk.   Dr. Sharma did not just uniformly check the most limiting box in every category, as is sometimes the case. Dr. Sharma opined Plaintiff could occasionally lift 10 pounds (1/3 of an 8 hour day) and rarely lift 20 pounds (5% of an 8 hour day), whereas the two consultative examiners opined Plaintiff could frequently lift 10 pounds (2/3 of an 8-hour day) and occasionally lift 20 pounds (1/3 of an 8-hour day).

Given the weight of the evidence in Plaintiff's favor regarding her shoulder,[7] as well as the application of the treating physician rule to this pre-March 27, 2017 claim, there is an insufficient basis to credit the consultative examining opinions (Drs. Georgis and Van Kirk) over the treating source as to her weight lifting limitations.[8]

---

[5] The Ninth Circuit has recently emphasized the importance of considering how a claimant's symptoms change over time.  See, *Smith v. Kijakazi*, 14 F.4th 1108, 1116 (9th Cir. 2021) (finding the ALJ "erred by seeking only to reach a single disability determination for the entire multi-year period, thereby failing to consider whether Smith was disabled for only a qualifying, early portion of that time.").

[6] An issue about which the Court expresses no opinion as the issue was not briefed.

[7] A post-surgically repaired rotator cuff with other extensive degeneration of moderate severity (or moderate to severe) documented upon MRI, mild atrophy of the deltoid on exam, range of motion deficiencies in every direction, and positive impingement sign.

[8] Defendant and/or the ALJ might respond that Dr. Sharma wrote "2019" in response to the question at the end of the questionnaire asking for the *earliest* date the above limitations would apply, a fact Defendant and the ALJ both observed in passing but did not return back to or explain its significance in their analysis.  However, Dr. Sharma's response does not preclude a finding of a closed period of disability at the beginning of the relevant period.  First, insofar as the form asks for 1 onset date of all limitations in question, the question is ill suited to a situation such as the present one involving multiple significant joint impairments such as the right shoulder and right knee which underwent MRI imaging and surgery nearly years apart.  Further, the response does not appear to be correct as to the right shoulder.  Virtually all of the physical examination evidence and imaging records of the right shoulder were in 2015 and 2016.  Further, Plaintiff's testimony about her shoulder limitations as early as 2015 was reasonably well

1

2

### c.      **Knees**

The ALJ similarly described the knee imaging findings as mild to moderate with mostly normal

physical examinations.  AR 27.  This characterization is supported with respect to the left knee, but not

the right knee.

A September 8, 2014, MRI of the left knee showed mild ACL sprain, minimal effusion, and

meniscal degeneration.  AR 398.  At Dr. Georgis' consultative exam on September 11, 2015, Plaintiff

exhibited mildly reduced flexion of both knees (110 to 130 degrees compared to normal of 150 degrees).

AR 450.  The knee examination was otherwise unremarkable without tenderness, crepitus, and with

normal strength in the muscles about the knee.  Dr. Georgis opined Plaintiff could stand and walk 6 of

8 hours and perform postural activities occasionally.  AR 452.

At visits occurring on November 16, 2015, December 16, 2015, and April 28, 2016, Dr. Sharma

noted tenderness, swollen bony hypertrophy of the left knee, and diagnosed popliteal cyst.  AR 492,

513, 515.  November 5, 2019 x-rays of both knees showed no acute osseous or articular abnormality,

scattered degenerative changes and narrowing of the medial greater than lateral tibiofemoral

compartment.  AR 503. Additional knee x-rays on December 16, 2019, showed mild osteoarthritis with

no significant effusion, negative soft tissues, small enthesophyte at the superior aspect of the patella,

mild to moderate osteoarthritis, and a small enthesophyte at the superior aspect of the patella.  AR 752–

53.

 With respect to the right knee, however, the ALJ noted:

> During an office visit with her primary care physician on January 9, 2020, the
> claimant complained of right knee pain that is worsening. She was advised to follow
> up with an MRI prior to considering possible surgical options [Exhibit 27F/1-4].
> The claimant followed up with an MRI of her right knee on January 16, 2020, with
> findings consistent with a meniscal tear as well as surrounding chondromalacia and
> CMP; however, the cruciate and collateral ligaments were intact. The claimant was
> therefore advised that meniscal tears generally do not heal on their own, and she was

corroborated by the imaging and examining evidence during that time period, such that Dr. Sharma's opinion as to a
2019 onset date would not be fatal.  In addition,  the ALJ's reasoning for discounting that testimony was again
predicated on an inaccurate characterization regarding the right shoulder medical evidence ("mild to moderate"
imaging; "mostly normal exams"; "routine and conservative" treatment).

given the recommendation for arthroscopy for chondroplasty and meniscectomy. The claimant therefore elected to proceed with this surgery, which was performed on February 18, 2020 [Exhibit 23F; Exhibit 27F/7, 9; Exhibit 28F/14-17].

AR 28. (emphasis added)

It's not clear if the statement concerning intact cruciate and collateral ligaments was intended to convey that the ALJ viewed the results as mild to moderate overall, but if so such an inference would not be reasonable. It would be a rare case for a patient to simultaneously suffer tears of the meniscus, the two cruciate ligaments (ACL, PCL), and the two collateral ligaments (MCL, LCL). Even in isolation, a meniscus tear requiring surgical repair is not a benign finding, particularly when accompanied by mild to moderate degenerative changes, compartment narrowing and chondromalacia (cartilage erosion).

Additionally, the ALJ's description of "surrounding chondromalacia" is imprecise and incomplete. The conclusion section of the MRI report described "Grade II to III tricompartmental chondromalacia." AR 756. There are four grades for chondromalacia. Grade II to III would not denote mild to moderate, but more so moderate, if not moderate to severe.

Further, as indicated in the name of the diagnosis ("tricompartmental"), there are three cartilage compartments involved (medial, lateral, and patellofemoral), and grade II to III was a global description. The individualized cartilage findings on the preceding page of the MRI report do contain more specific severity descriptions. The medial compartment showed "moderate diffuse cartilage loss," the lateral compartment showed a "focal area of partial thickness cartilage loss," but the patellofemoral compartment showed "*near full thickness cartilage loss . . .*" AR 755 (emphasis added). This is better characterized as moderate to severe cartilage loss overall if one is inclined to use the ALJ's three item scale (mild, moderate, severe).

The ALJ would have been better to have quoted the language the radiologist used to describe the pertinent findings without attempting to put them all into one imprecise box ("mild to moderate findings"). Granted, if an ALJ recited every word in a lengthy MRI report, the decision would be

unnecessarily onerous and verbose.  But the ALJ cannot truncate the MRI findings and describe it as "surrounding chondromalacia"[9] to support a generalization about "mild to moderate" imaging findings when the MRI report suggests more severe findings, including near full thickness cartilage loss in the patella femoral compartment as well as a torn meniscus.

As to the physical exams, at the consultative examination with Dr. Van Kirk on December 28, 2019, it was noted that Plaintiff could only squat down halfway due to knee pain, though the knee examination was otherwise unremarkable.  Dr. Van Kirk opined that Plaintiff could stand and walk 6 of 8 hours and occasionally perform postural activities due to restricted lumbar spine ROM and right knee pain.   AR 745.  However, it is not clear how Plaintiff could perform a full squat occasionally (1/3 of an 8 hour day) if upon examination she was unable to perform one full squat.  Dr. Sharma, by contrast, opined Plaintiff could only perform postural activities (including squatting) rarely (1% to 5% of an eight hour day) which would be a more supported finding.

Further, despite the fact that Dr. Van Kirk noted a normal gait without a limp (and thus presumably surmised she could stand and walk 6 of 8 hours), the right knee MRI two weeks after Dr. Van Kirk's exam as described above noted a torn meniscus and grade II-III tricompartmental chondromalacia which required surgical repair. AR 755-756.  This lends more support to Dr. Sharma's opinion that Plaintiff could stand/walk no more than 30 consecutive minutes and less than 2 hours in an 8-hour day.  If Dr. Van Kirk had the benefit of the MRI report at the time of the consultative exam, he may well  have been similarly inclined to credit Plaintiff's alleged standing/walking limitations even in the absence of a detectable gait abnormality.

In sum, with respect to the limitations attributable to Plaintiff's right knee, the ALJ was inaccurate in characterizing the imaging as "mild to moderate" and the physical exams as "mostly

---

[9] Or isolate such a truncation used elsewhere in the record and adopt it in lieu of the actual MRI report.

normal."  The ALJ was equally not justified in rejecting both Dr. Sharma's opinion and Plaintiff's testimony on those bases.

**d**.   **Cervical and Lumbar Spine**

A 2009 cervical spine MRI showed mild osteophytic changes, right paracentral disc bulge osteophytic complex with effacement of the right anterior thecal sac, and that the posterior margin of the disc in the right paracentral regional measured approximately 2.0 mm beyond the adjacent posterior vertebral margins.  AR 437.       As for examinations, Dr. Sharma's visit notes in February, June, and November of 2015 noted cervical spine spasms, trigger points of the trapezius and rhomboid muscles, and 50% reduced cervical range of motion.  AR 465-66; 487; 492.   At the September 2015 consultative examination with Dr. Georgis, cervical spine ROM was similarly reduced by approximately 30% throughout (flexion, extension, and rotation).  AR 449.  At the December 2019 consultative examination with Dr. Van Kirk, Plaintiff had full ROM of her cervical spine.  AR 745.

As for lumbar spine imaging, an April 17, 2018 MRI noted DDD at L4-5 with mild to moderate disc space narrowing and facet hypertrophy.  AR 806.  Similar findings were noted again on November 15, 2019, in addition to lateral recess narrowing.  AR 834.  A November 5, 2019 x-ray noted mild degenerative spondylitic changes and trivial endplate depressions. AR 500.

As for lumbar spine examinations, Dr. Georgis noted reduced ROM and tenderness in September 2015.  AR 449.  Similar findings were noted at Dr. Van Kirk's December 2019 examination (AR 747), and at Pacific Spine and Pain center in January 2020 (AR 766-68),  however the examinations were otherwise unremarkable with normal lower extremity muscle strength, normal sensation, and normal reflexes.  *Id.*

The ALJ's characterizations of mild to moderate imaging and mostly normal physical examinations were reasonably accurate as to the cervical and lumbar spine (at least more so than as to

the shoulder and knee).  As for treatment, apart from the medications discussed above (opioids and muscle relaxers), it does not appear there was any significant treatment.  Lumbar facet injections were mentioned in the Pacific Spine and Pain records (AR 762-65) but, as the ALJ noted, there were no records documenting that the injections were performed.

In any case, as compared to the right shoulder and right knee (both of which required surgery), the records concerning the cervical and lumbar spine contained no comparably severe imaging findings, examination findings, or treatments.  Further, the exertional limitations attributable to the cervical spine would overlap to a large extent with that of the right shoulder, which is similarly true of the lumbar spine and right knee.  There is therefore no reason to conclude that the cervical and lumbar spine impairments would cause more significant exertional impediments than the right shoulder and knee.

The lone exception is perhaps with respect to sitting, as Plaintiff testified she could not sit more than 10 minutes due to back pain (AR 53), and Dr. Sharma similarly limited Plaintiff to no more than 30 minutes of sitting but with the option to alternate between sitting and standing at will, and must walk for 5 minutes every hour (AR 748-49).   The ALJ, by contrast, found Plaintiff could sit 6 of 8 hours "with the ability to stand and stretch, or rest and elevate the legs, every two hours for 10 to 15 minutes, *falling within the normal breaks and lunch periods*," (AR 25, emphasis added).  This appears to have been intended to give the impression that the alleged sitting restrictions were being accommodated to some extent, even  though  an employee would  seemingly be able to do as they wish during normal breaks and lunch periods.

Plaintiff contends that if she was limited to sedentary work (rather than light work as the ALJ found here), given her vocational profile (age, education, work history), a finding of "disabled" would be directed by Medical-Vocational Rule 201.09.  Br. at 18.  If true then the alleged sitting restrictions would not be outcome determinative and any failure by the ALJ to incorporate such sitting restrictions would be harmless error.

e.    **"Routine and Conservative" Treatment;**
        **Improvement with Surgery**

16

1

2      This characterization by the ALJ is unsupported.  As  discussed in detail above, Plaintiff was

3  prescribed two opioids (Vicodin and Tramadol), cortisone injections, and underwent two surgical

4  procedures (one in 2014 for a torn right rotator cuff, and one in 2020 for a torn right meniscus).  Short

5  of total joint replacement, the treatment regimen here may well have run the gamut of available options,

6  and certainly could not be accurately described as routine and conservative.

7      Indeed, ALJs often cite the lack of surgery or surgical recommendation in support of a finding

8  that a claimants' care was conservative.  Conversely, where a claimant *does* have surgery, the surgery

9  is often presumed to be a success, a presumption substantiated by little more than generalized references

10  to the claimant "doing well" without any post-op complications.  This can also be said where the

11  claimant "admits" to any improvement after the surgery regardless of contextual factors, including, how

12  significant the improvement was, how severe the baseline symptoms were, how long the impairment

13  persisted untreated before surgical correction, and how long the post-surgical recovery process took.

14

15      The agency's reliance on both surgery and lack of surgery to support a non-disability finding is

16  thus paradoxical.  It leaves room for essentially one scenario suggestive of disability-- where a claimant

17  whose impairment is so severe as to warrant the non-conservative treatment of surgery, with the surgery

18  being an utter and unmistakable failure and no treatment options remaining to enable the claimant to

19  regain function.  However, the disability standard under the Act is not quite that demanding.[10]

20

21      The ALJ offered the following pertinent discussion regarding Plaintiff's improvement with

22  surgery:

23          In addition, although the claimant underwent surgery on her right shoulder, as well as
           her right knee, she reported improvement after both surgeries, which improvement is
24          also supported by the medical evidence of record.
           . . .
25          She has stated that although the surgery on her shoulder did help, she can barely use
           her shoulder without experiencing "excruciating" pain.
26

27          AR 25–26.

28  ─────────────────────
[10] "The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits . . ."
*Fair v. Bowen*,  885 F.2d 597, 603 (9th Cir. 1989).

As the ALJ's own discussion reveals, improvement is a relative term, the significance of which depends on the severity of the baseline symptoms and the amount of the improvement. The discussion reveals that the improvement was not significant.

More specifically as to the knee surgery, the ALJ explained as follows:

> Subsequent to the surgery, the claimant was seen by her primary care physician on February 25, 2020, and reported that she is recovering well since the surgery. She also reported that she is going to physical therapy and will also be following up with pain management [Exhibit 26F/2]. The claimant also reported in a follow up visit on February 26, 2020, that her right knee pain is minimal. and she was also able to tolerate range of motion of the knee without significant discomfort. She was also scheduled for physical therapy at this time [Exhibit 27F/11].

> However, in follow up at Pacific Spine and Pain Center on February 25, 2020, the claimant alleged continued back, neck, head, and leg pain, as well as weakness and tingling in her hands. It was noted that she recently had right knee surgery and is doing well after the surgery, other than having an antalgic gait and using crutches for mobility at this time.

AR 28.

"Recovering well" (or more commonly "doing well post-op") are non-specific descriptions. Those statements refer generally to the lack of surgical complications, no infections, appropriate incision site healing, etc. They do not suggest the underlying problem has been resolved, nor do they have significant predictive value as to the long term recovery of function.

The reference to lack of pain likely refers to the improvement in the acute post-surgical pain, not a reduction in the baseline pain with ordinary activity because simply put, Plaintiff had not yet returned to ordinary activity. As the ALJ's discussion noted, Plaintiff was still using crutches to walk. Post-surgical pain level without weight bearing is not a meaningful barometer of surgery success. Thus if the right knee could not yet tolerate walking without crutches, then the reference to range of motion was also likely to a non-weight bearing range of motion (e.g., sitting with the legs hanging off the examination table).

Further,  even if these references did refer to pain-free range of motion while briefly bearing full weight without crutches during an isolated post-surgical examination, it is quite an inferential leap to conclude that, from that point forward, Plaintiff would be able to stand and walk 6 of 8 hours and bend/squat/stoop 2 of 8 hours in the context of full time work.   Nor can one surmise based on these references that Plaintiff would be able to do so in the immediate future, especially as she had physical therapy scheduled (aqua therapy, AR 765).  The success of the procedure would presumably be addressed at the completion of her surgical recovery and physical therapy, either by the physical therapist at the time of her discharge, by her PCP, knee surgeon, or even by a consultative examiner.

That is the conundrum with the timing of events in this case.  Dr. Van Kirk performed a consultative examination at the agency's request on December 28, 2019.   A little more than two weeks later on January 16, 2020  an MRI of her right knee showed a torn meniscus. Plaintiff thus had surgery on February 18, 2020, attended the administrative hearing on April 15, 2020, and the ALJ issued an unfavorable decision on April 24, 2020.

As of her February 26, 2020 follow up, she was instructed to modify activities and follow up in 6 weeks  (AR 801), which would be roughly the date of the administrative hearing.  It is not clear if any such follow up examination took place, or what it showed.  Nor is it clear whether Plaintiff underwent the scheduled physical therapy, whether it was successful, whether she had a follow up examination with her doctor, or whether she had one scheduled.  Recovery times for meniscus surgery are highly variable, ranging from as little as a few weeks to as long as 9 months[11] depending on the nature and location of the tear and the type of surgery performed.[12]  But, of note, D.O. Le explained as follows at the pre-op examination:

---

[11] https://www.hss.edu/conditions_meniscus-surgery-meniscectomy.asp

[12] The operative report dated February 18, 2020, documents right knee scope, chondroplasty patella CM3, medial femoral condyle CM, and medial meniscectomy.  AR 818-819.  The healing time and prognosis for this surgery is

Bilateral knees, right worse than left CMP. MMT, c/a her xrays revealed significant degenerative changes, BOB lateral facet. tier pain is severe and function is poor. The implication of the physical . exam and my impressions were explained to the patient at length. The location of the pain and the presentation is consistent with meniscal tears and internal derangement. 1 have explained the pathology to the patient. I explained that about 90% of meniscal tears will not heal because of the blood supply and the tear pattern. I went over the treatment options including observation, arthroscopic partial meniscectomy, and arthroscopic meniscal repair. I explained that of the 10% of meniscal tears that are repairable, about 70-80% will heal. I went over the benefits and complications of the treatment options. I explained that if there is some arthritis in the area of a meniscal tear, treating that area might lead to increased arthritic symptoms. The patient is interested. in getting an MRI. The patient will follow up after the MRI

AR 794.

From this it is far from clear whether the procedure was likely to have resulted in a full recovery of knee function.  The successful correction of the meniscus injury was no guarantee and even if so, there was the possibility of worsening underlying arthritis.   At a minimum the appropriate course of action would have been for the ALJ to order another consultative examination following the surgery prior to reaching a conclusion about Plaintiff's disability status up to and including the decision date.[13]

Ordering such an examination at this point would not be helpful as it would not reflect her functional status 4 years ago.  But an appropriate medical professional could presumably review the post-surgical records and opine on long-term function with more accuracy than Dr. Van Kirk did prior to the MRI and the surgery.

Further, there is a potentially significant period of *pre-surgery* knee dysfunction unaddressed.  The meniscus tear did not materialize out of thin air, and there was no inciting event noted in the record.  Rather, the January 9 visit notes at which the MRI was ordered reflect Plaintiff

---

well beyond the expertise for a layperson such as the undersigned or the ALJ to address.

[13] The impact of that decision extends beyond the date of the ALJ's decision.  To the extent Plaintiff did not fully recover from the surgery and sought to reapply for benefits, any subsequent application would have to overcome the *Chevez* presumption of continuing non-disability.

reported worsening knee pain with an onset date many years prior, level 6 out of 10 at rest and 9 out of 10 with activity.  AR 801.  The clinician diagnosed "derangement of posterior horn of medial meniscus due to old tear or injury."  AR 793.  This suggests the MRI pathology was present significantly in advance of the January 2020 MRI date.

**VI.    Conclusion and Remand for further Proceedings**

The records regarding Plaintiff's right shoulder impairments and right knee impairments are not in agreement with the ALJ's generalizations concerning "mild to moderate" imaging studies, "mostly normal physical examinations," "routine and conservative treatment," or improvement with surgery. In addition, substantial evidence does not support the ALJ's assessed RFC, the ALJ's rejection of Dr. Sharma's opinion, nor the ALJ's rejection of Plaintiff's testimony.

**A.    Right Shoulder**

As to Plaintiff's alleged disability onset date in October 2015, her right shoulder had recently undergone arthroscopic repair of a torn rotator cuff.  An MRI in November of 2015 depicted additional abnormalities.   They were mild to moderate findings at a minimum with other abnormalities unaccompanied by severity description (but which Dr. Sharma characterized as moderate to severe degenerative changes).  Plaintiff also exhibited various abnormalities upon examination by Drs. Sharma and Georgis' from September 2015 through April 2016 including, muscle atrophy about the shoulder, upper extremity weakness, 50% range of motion deficiency in flexion and at least some ROM restriction in all other directions (extension, abduction/adduction, internal/external rotation).   AR 450–51, 492, 513-515.

Oddly, there is a lack of medical evidence from April 2016 onward (save for a lumbar spine MRI and associated examination) until approximately the time of the second consultative examination with Dr. Van Kirk in December of 2019, by which time Plaintiff did not exhibit the same shoulder abnormalities, other than for slow (but full) range of motion.

Nevertheless, the dysfunctions noted from the September 2015 consultative exam[14] through the April 2016 examination with Dr. Sharma would not likely have disappeared overnight and reasonably could have been expected to continue for a period of at least 12 months.  This could support a closed period of disability if Plaintiff is correct that Medical-Vocational Rule (Grid Rule) 201.09 would mandate a finding of disability at the sedentary exertional level for an individual with Plaintiff's vocational profile (ag, education, work experience).[15]

### B.   Knee

Similarly with respect to Plaintiff's right knee, the ALJ's characterizations as described above were not altogether factually accurate.  Dr. Van Kirk's December 2019 opinion with respect to Plaintiff's knee impairment and its functional impact was rendered without the benefit of the subsequent MRI in January of 2020 showing meniscal tear and grade II to III tricompartmental chondromalacia requiring surgical repair.  Dr. Van Kirk even noted Plaintiff was unable to squat more than halfway down, and he gave no reason to believe Plaintiff was malingering, embellishing symptoms, or giving anything but a full effort.  Thus his opinion that Plaintiff can perform such a maneuver (ostensible a *full* squat) up to 1/3 of an 8 hour day is inexplicable if she could not perform even one full repetition on command.   Dr. Van Kirk's opinion regarding Plaintiff's postural capabilities and her ability to stand/walk 6 of 8 hours is at odds with Plaintiff's testimony, with Dr. Sharma's opinion, and with the subsequent MRI and surgery.

Further, given that the examining clinician pre-MRI (D.O. Le) diagnosed a degenerative condition attributable to an old injury (and Plaintiff's own description of worsening pain onset 6 years prior), as opposed to any acute injury or aggravating event, there is sufficient reason to believe the meniscal tear and grade II-III tricompartmental chondromalacia were present much earlier than at the time of the January 2020 MRI.

---

[14] Though technically the disability onset date was the following month.

[15] An issue about which the Court expresses no opinion as the issue was not fully briefed and is not central to the conclusion here that the RFC was unsupported.

1

Hence there is more than ample medical imaging evidence, physical examination evidence,

2

opinion evidence, and testimonial evidence to support a finding that Plaintiff's right knee impairment

3

and subsequent surgery rendered her unable to perform the light exertional work described in the RFC

4

for a period of at least 12 months.[16]  The only evidence to the contrary is Dr. Van Kirk's consultative

5

opinion, which again was rendered before the MRI and surgery, and which was belied by Dr. Van

6

Kirk's own examination finding that Plaintiff could not perform a full squat.

7

8

Remand is therefore appropriate for the ALJ to determine a reasonably likely onset date of the

9

dysfunction depicted in the January 2020 right knee MRI (even if not going back as far as the alleged

10

onset date of overall disability), and the duration the post-surgical recovery period would have lasted

11

(or did in fact last) without taking for granted that Plaintiff necessarily did at some point regain

12

sufficient function of the knee to perform the range of light exertional work specified in the RFC--

13

particularly in light of Plaintiff's other conditions including: obesity (5 foot 4 and 185 to 240 pounds)

14

and degenerative changes of her various other joints (albeit mild), including her left knee (also showing

15

meniscal degeneration) and lumbar spine.

16

17

In addition to a new hearing, review of any newly generated records following the surgery

18

would be appropriate to the extent they speak to the functioning of the right knee during the relevant

19

period and thereafter.  Additional consultative guidance may also be appropriate to review and interpret

20

the related records, with the understanding that an in person examination at this stage would likely not

21

approximate Plaintiff's functioning from more than 4 years earlier.

22

Finally, to the extent Plaintiff is mistaken about whether Medical-Vocational Rule 201.09

23

would mandate a disability finding at the sedentary exertional level for an individual with Plaintiff's

24

vocational profile (age, education work history),[17] then additional consideration must be given to

25

26

27

[16] The Ninth Circuit has recently emphasized the importance of considering how a claimant's symptoms change over time.  See, *Smith v. Kijakazi*, 14 F.4th 1108, 1116 (9th Cir. 2021) (finding the ALJ "erred by seeking only to reach a single disability determination for the entire multi-year period, thereby failing to consider whether Smith was disabled for only a qualifying, early portion of that time.").

28

[17] An issue about which the Court expresses no opinion as the issue was not briefed.

Plaintiff's ability to sit, need for a sit/stand option, and her need for leg elevation and period breaks to walk 5 minutes each hour as opined by Dr. Sharma.   This matter was not given much attention, and the ALJ's only apparent attempt to incorporate such a limitation was, "she can sit for six out of eight-hour workday, with the ability to stand and stretch, or rest and elevate the legs, every two hours for 10 to 15 minutes, *falling within the normal breaks and lunch periods.*" AR 25 (emphasis added). However this does not accommodate any unique limitations Plaintiff might have with respect to extended sitting.  If the ALJ does not conclude that Dr. Sharma's opinion is supported in those respects (sit/stand option, walking 5 minutes per hour, periods of leg elevation), that should be addressed directly and with some supporting explanation.[18]

### VII.   Order

For the reasons stated above, substantial evidence and applicable law do not support the ALJ's conclusion that Plaintiff was not disabled.   Accordingly, it is ordered that the Commissioner's decision is reversed and this matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.  The Clerk of Court is directed to enter judgment in favor of Plaintiff Minerva Garza and against Defendant Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   __**February 8, 2024**__          _____**/s/ Gary S. Austin**_____
                                                UNITED STATES MAGISTRATE JUDGE

---

[18] Which is not to suggest the ALJ must provide an exegesis or an item by item analysis of each limitation identified in Dr. Sharma's opinion.   But sitting limitations are categorically different than other "exertional" limitations (lift/carry, stand/walk, bend, stoop, etc), and are best addressed separately rather than subsumed  under the broader analysis of Plaintiff's abilities.  In other words, even if all agree that Plaintiff can at least meet the minimal exertional requirements of sedentary work (lift no more than 10 pounds, stand/walk no more than 2 hours, etc), it should not be necessarily concluded that the claimant can also sit 6 of 8 hours.